956 F.2d 268
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
C.J. ANTRICAN and Joann Antrican,
Plaintiffs-Appellees/Cross-Appellants,
v.
GRAND EXHAUST SYSTEMS, INC, and Armada Corporation,
Defendants-Appellants/Cross-Appellees.
 Nos. 91-5420, 91-5518.
 United States Court of Appeals, Sixth Circuit.
 March 9, 1992.
 
 Before BOYCE F. MARTIN, Jr. and MILBURN, Circuit Judges, and CONTIE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Defendants Grand Exhaust Systems, Inc., and Armada Corporation appeal from a judgment rendered by the district court after a bench trial in this diversity contract action. Plaintiffs C. Joe Antrican and Joann Antrican cross-appeal from the same judgment. The principal issues in this case are (1) whether the district court erred in finding that plaintiffs breached their non-competition agreements with defendants, (2) whether the district court erred in allowing a $40,000 setoff for plaintiffs' breach of the non-competition agreements, (3) whether the district court erred in failing to award interest and attorney's fees as called for by a promissory note made by defendants, (4) whether the district court erred in refusing to award setoffs to defendants for uncollectible accounts receivable or obsolete inventory sold them by plaintiffs, and (5) whether the district court erred in refusing to consider defendants' claim that they were entitled to recover $40,000 previously paid to the plaintiffs as partial consideration for their non-competition agreements. For the reasons that follow, we affirm in part, reverse in part and remand.
 
 I.
 
 2
 This action arises out of a bulk sales transaction in which plaintiffs and two of their wholly-owned corporations, Hilltop Exhaust Warehouse, Inc., and Hilltop Muffler Shops, Inc., sold the assets of the corporations to defendant Grand Exhaust Systems, Inc., a Michigan corporation ("Grand"). The parties entered into a written agreement ("sales agreement") on August 26, 1986, in which plaintiffs and their corporations sold $467,006.96 worth of assets consisting of: (1) fixed assets, including motor vehicles, equipment, office supplies, etc., in the amount of $72,000; (2) inventory comprised mainly of tail pipes and mufflers in the amount of $270,853.97; and (3) accounts receivable in the amount of $124,147.99.
 
 
 3
 As a part of the consideration for the transfer of these assets, Grand assumed various obligations of the sellers to third parties and cancelled sellers' indebtedness to it, all in the sum of $374,261.44. The amount by which the assets transferred exceeded the liabilities assumed--$92,745.52--became the principal amount of a promissory note made by Grand in favor of the plaintiffs and guaranteed by the other defendant in this case, Armada Corporation ("Armada"). By its terms, the note bore interest at the rate of 8.5 percent per annum and called for payment in five equal annual installments of $18,549.10 each, the last of which was due on September 1, 1991. The note, however, contained an acceleration clause, a special default interest rate at the announced prime rate of Manufacturers National Bank of Detroit plus 2 percent, and it provided for the costs of collection and attorney's fees of not less than 15 percent of the amount due upon default.
 
 
 4
 The sales agreement of August 26, 1986, also contained two important warranties made by plaintiffs to Grand: (1) that the accounts receivable purchased by defendant would be collectible when due in the ordinary course of business, and (2) that the inventory purchased by defendant contained no more than $2,000 worth of obsolete inventory. The agreement further provided that plaintiffs would indemnify and reimburse defendant for any sums it paid or became "obligated to pay on account of any material breach of any material representation, warranty or covenant made by [plaintiffs] in this Agreement...." J.A. 262. It also stated that Grand could offset any obligation it owed to plaintiffs by the amount of any indemnification it might be entitled to, and it specifically provided that Grand could offset note payments due the Antricans by the amount of any accounts receivable it had been unable to collect by August 1, 1987. Id. The promissory note for $92,745.52 refers to the terms of the sales agreement and recites that "the principal amount of this Promissory Note is subject to offset under certain conditions pursuant to the terms of said Purchase Agreement." J.A. 273.
 
 
 5
 As contemplated by the sales agreement of August 26, 1986, each plaintiff entered into a separate non-competition agreement with Grand on September 25, 1986. In consideration for their promises not to compete against Grand for a period of five years in the manufacturing and wholesale exhaust system distribution business within the states of Tennessee, Alabama, and Georgia, Grand paid each plaintiff $20,000 upon the execution of the non-competition agreement and agreed to pay each plaintiff an additional $20,000 in four annual installments of $5,000 each, payable on August 1, 1987, 1988, 1989, and 1990. The non-competition agreements contained a clause stating: "Noting [sic; Nothing] in this Agreement shall prevent Antrican from owning and operating retail muffler shops or selling automotive exhaust products to automotive parts stores." J.A. 276 (emphasis added).
 
 
 6
 On July 29, 1987, Eugene Sokoloff, Treasurer of Grand, wrote the plaintiffs advising them that payments due under the non-competition agreements and the promissory note would be withheld because of unspecified breaches of warranties concerning inventory and accounts receivable. On September 23, 1987, Lowell Robinson, Grand's vice-president, wrote a more detailed letter to plaintiffs stating that $70,574.11 of the accounts receivable remained uncollected and that approximately $50,000 of the inventory sold had been determined to be obsolete. The letter further advised that those amounts would be deducted from any monies due to the plaintiffs under the purchase agreement. Neither of these letters made any mention of an alleged violation of the non-competition agreements.
 
 
 7
 On June 27, 1989, the Antricans filed a complaint claiming payment due under the promissory note in the principal sum of $92,745.52 together with interest of $43,516.12 through August 1, 1990. It also requested reasonable attorney's fees of not less than 15 percent and the default rate of interest. The complaint further claimed that defendants had breached the non-competition agreements by failing to pay each of the Antricans the $20,000 remaining due them.
 
 
 8
 Defendants answered, denying all of plaintiffs' claims, and counterclaimed, alleging that plaintiffs had breached their warranties in the sales agreement relating to the collectibility of accounts receivable and the amount of obsolete inventory. They also alleged that plaintiffs had breached their non-competition agreements and that the breaches cut off plaintiffs' rights to any further payments. Defendants concluded that the damages due them on their counterclaims offset any money they might owe plaintiffs by virtue of the note or non-competition agreements.
 
 
 9
 The case was tried to the district court without the intervention of a jury in August, 1990, and the court filed a memorandum opinion on January 14, 1991, in which it concluded that plaintiffs were entitled to recover the full face amount of the promissory note, although without interest or attorney's fees, and that plaintiffs were not entitled to recover the remaining $40,000 allegedly owed them pursuant to their non-competition agreements because plaintiffs had breached their agreements.
 
 
 10
 As to defendants' counterclaims, the district court denied defendants any recovery for the claimed breaches of plaintiffs' warranties concerning obsolete inventory or the collectibility of accounts receivable. It also declined to entertain defendants' claim that they should recover the $40,000 they paid plaintiffs on September 25, 1986, on the non-competition agreements, the court ruling that defendants had not properly raised this counterclaim in their pleadings or during the trial. From a judgment in conformity with the district court's opinion, all the parties have timely appealed.
 
 II.
 A.
 
 11
 This court reviews a district court's findings of fact only for clear error under Rule 52(a) of the Federal Rules of Civil Procedure. Thus, we will overturn a district court's findings of fact only when we are "left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395 (1948). This court has noted that
 
 
 12
 [t]he reviewing court oversteps the bounds of its duty under Rule 52 if it undertakes to duplicate the role of the lower court.... If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.
 
 
 13
 Henry v. Lennox Indus., Inc., 768 F.2d 746, 750 (6th Cir.1985). A district court's determination of questions of law is reviewed de novo. Loudermill v. Cleveland Bd. of Educ., 844 F.2d 304, 308 (6th Cir.1988).
 
 B.
 
 14
 The district court found that plaintiffs breached their non-competition agreements and therefore could not recover the $20,000 remaining unpaid each plaintiff. Specifically, it found that
 
 
 15
 Mrs. Antrican admitted that A & A Speed and Performance, d/b/a A & A Mustang was a distributor of Mustang parts including exhaust parts in the wholesale business in Tennessee. The court finds that this act violated the non-competition agreements.
 
 
 16
 J.A. 35 (emphasis added). This was the only violation cited by the court.
 
 
 17
 Mrs. Antrican testified about the business activities of A & A Mustang:
 
 
 18
 We do manufacture early model '64 1/2 to '70 exhaust systems for Mustangs and sell to some gentleman in Connecticut and Maryland up in there to a wholesale business. The primary business is restoration of the early model Mustangs and selling parts for the early model Mustangs.
 
 
 19
 J.A. 158. She confirmed this testimony on cross-examination in answer to a question asking whom A & A did business with:
 
 
 20
 It's [A & A Mustang] basically a jobber store,[1] just anybody that walks in off the street. We do some sales with a company in Maryland and one company in Connecticut as far as exhaust systems go. We sell them exhaust systems. We manufacture the exhaust systems for those and sell to them. I believe we are doing a lot of import business with them.
 
 
 21
 J.A. 181-82.
 
 
 22
 This testimony proves that A & A Mustang, an entity owned and controlled by the plaintiffs, manufactured exhaust systems in Tennessee and sold them at wholesale to companies in Maryland and Connecticut. The district court found this activity to be a breach of the non-competition agreements, which forbid "manufacturing and wholesale exhaust system distribution business" within the states of Tennessee, Alabama, and Georgia. At oral argument, however, counsel for defendants conceded that during the years in question plaintiffs were not engaged in manufacturing and selling wholesale exhaust systems within the states of Tennessee, Alabama, or Georgia in violation of the non-competition agreements. Based on this concession and on the testimony of Mrs. Antrican, we must hold that the district court committed clear error in finding that plaintiffs breached their non-competition agreements.
 
 
 23
 Having found that plaintiffs breached their non-competition agreements, the district court concluded that plaintiffs could not recover the remaining $40,000 of consideration due them under the non-competition agreements.
 
 
 24
 The law is well-settled that there can be no recovery of damages on a theory of breach of contract by the party who himself breached the contract. Santa Barbara Capital Corporation v. World Christian Radio Foundation, Inc., 491 S.W.2d 852 (Tenn.Ct.App.1972). Thus, the court concludes that the Antricans are not entitled to be paid the remaining $40,000 pursuant to their non-competition agreements because they breached those agreements.
 
 
 25
 J.A. 49. This, too, was error.
 
 
 26
 In Santa Barbara Capital Corp. v. World Christian Radio Foundation, Inc., 491 S.W.2d 852, 857 (Tenn.App.1972), the court, in a case not involving non-competition agreements, did state as a general rule that "there can be no recovery for damages on the theory of breach of contract by the party who himself breached the contract." As accurate as that general statement may be for some purposes, it appears that a different analysis is employed by the courts of Tennessee in situations dealing with non-competition agreements. In Young v. Jones, 255 S.W.2d 703 (Tenn.App.1952), Dr. Jones, an established veterinary doctor, agreed to sell his practice to Dr. Young for the sum of $10,000 payable in monthly installments over a period of several years. As part of the agreement, Dr. Jones agreed not to engage in the practice of veterinary medicine in Washington County, Tennessee, for "as long as this contract is not breached...." Id. at 704. Dr. Young brought an action for cancellation of the unpaid balance of the purchase price when he allegedly discovered that Dr. Jones had re-entered the veterinary practice contrary to the terms of their agreement.
 
 
 27
 On the specific question of the relief to be afforded in such a case, the Tennessee Court of Appeals held that Dr. Young would not be entitled to the cancellation of his regular contract installment payments even if Dr. Jones breached his covenant not to compete. The court was of the view that, because the covenant not to compete was to run for Dr. Jones' lifetime while the contract price was to be paid in full after approximately five years, the parties' promises were independent of each other, and the performance of one did not depend, as a condition precedent, on the performance of the other. The court concluded:
 
 
 28
 We are of the opinion, therefore, that the contract in the instant case was severable and that performance by either party was not subject to performance by the other as a condition precedent; that complainant [Dr. Young] would not, therefore, be entitled to cancellation of the balance due on the note, even if a breach of contract had been proved; that he has never prayed for nor proved any damages and does not now seek any; that his bill must be dismissed.
 
 
 29
 Id. at 706.
 
 
 30
 In Young, the Tennessee Court of Appeals relied on Bradford & Carson v. Montgomery Furniture Co., 92 S.W. 1104 (Tenn.1906), a case in which a group of partners sold their furniture business to another group for the sum of $28,537.01 which was paid in full at the time of sale. The good will of the business and the seller's agreement not to compete were separately valued at $3,000, and buyers made a note to sellers for for $3,000, payable in one year, as separate consideration. When the sellers filed suit to recover on the note, the buyers proved that the sellers had breached their agreements not to compete, and the lower court dismissed sellers' action on the note.
 
 
 31
 The Tennessee Supreme Court agreed that the sellers had breached their contracts not to compete, but it disagreed with the lower court's conclusion that this breach was a complete defense to the recovery sought upon the note.
 
 
 32
 It is clear, therefore, that it could not have been the intention of the parties that the performance of this contract by either party was conditioned upon its performance by the other. The terms of the contract render such an intention absolutely impossible of execution. We think therefore, it is clear that the contract between the parties is severable, and that the breach by the complainants of that part of the agreement binding them not to resume business for three years cannot defeat their action upon the note of the defendants. It would be unjust to so hold, since the defendants have received by far the larger part of the consideration of their note--the good will of the firm of Bradford & Carson, and the performance of their contract to cease business for nearly one-third of the time agreed upon ....
 
 
 33
 Id. at 1110. The court then held: (1) that sellers were entitled to judgment on their note despite their breach of the non-competition agreements, and (2) that the buyers' remedy lay in a setoff against their debt due on the note to the extent they could prove damages from the sellers' competition.
 
 
 34
 In this case there is no indication that the parties intended their promises in the non-competition agreements to be mutually dependent. The Antricans agreed not to compete until after September 25, 1991, and Grand agreed in exchange to pay $80,000, $40,000 initially, and the balance in equal yearly installments ending on August 1, 1990. Because the last payment would be made on August 1, 1990, at a point when the Antricans would still be required to perform for an additional fourteen months, we hold that the parties did not consider the installment note payments to be contemporaneous payments for plaintiffs' continued forbearance to compete. In that regard, this case is similar in its facts to Bradford & Carson.
 
 
 35
 There is another similarity between this case and Bradford & Carson. In Bradford & Carson, the Supreme Court of Tennessee believed it would be "unjust" to allow a complete rescission of the contract when it was evident that the sellers had complied for some time with their covenant not to compete. Id. at 1110. In this case, the record contains no evidence bearing on the degree of the Antricans' alleged breaches of their non-competition agreements, either in time or extent. There is no testimony concerning the amount of the business A & A Mustang did with its customers in Connecticut and Maryland, nor can it be determined when the non-competition agreements were first breached. Under these circumstances, we believe that the Supreme Court of Tennessee would hold that the promises made by the parties in the non-competition agreements were not "precedently conditioned" on each other, Young, 255 S.W.2d at 705, and that it would be "unjust," Bradford & Carson, 92 S.W. at 1110, to permit defendants a $40,000 recovery, albeit by setoff, where the time and extent of the breach are unknown and where the district court stated that it did "not consider the plaintiffs' breach of the non-competition agreements a serious violation." J.A. 49 n. 12.
 
 
 36
 Under these circumstances, we hold that the district court erred in refusing to award plaintiffs a judgment against defendants for the balance of payments due under the non-competition agreements. We find no breach[2] of the non-competition agreements by plaintiffs, and, were there one, defendants have proven no damages.
 
 C.
 
 37
 While plaintiffs contend that the district court erred in allowing the defendant's a $40,000 setoff of the money remaining unpaid on the non-competition agreements, defendants argue that the district court erred in refusing to award them a judgment against plaintiffs for the $40,000 they initially paid plaintiffs ($20,000 each) in respect of their non-competition agreements. The district court refused to consider the claim, finding that defendants raised this matter for the first time in their post-trial proposed findings of facts and conclusions of law. The court noted
 
 
 38
 that defendants neither requested this specific relief in their counter-claim [see Doc. 6] nor in their contentions and suggested issues for the jury [see Doc. 36] which were incorporated in the final pre-trial order [see Doc. 40]. Rather, the defendants contended only that they should not be required to make any further payments pursuant to the non-competition agreements.
 
 
 39
 J.A. 49 n. 12.
 
 
 40
 The district court was correct in refusing to entertain, post-trial, issues neither made up by the pleadings nor actually litigated between the parties. That defendants had not even an intention to raise the issue may be seen in the discussion between the court and counsel for defendant Grand at the opening of the trial. Counsel explained defendants' position as follows:
 
 
 41
 Mr. KULLEN: ...
 
 
 42
 The amounts credited to and properly credited to Grand and the amount of the offsets does exceed the amount that plaintiffs are requesting and as such instead of the plaintiffs being entitled to any money in this matter, in reality, the plaintiffs owe Grand due to the fact that in taking account of all of these assets and liabilities, in lieu of actually having a positive let's say net worth you actually have a negative net worth which results in payment being due to Grand Exhaust.
 
 
 43
 THE COURT: What about the money you are supposed to pay under the non-competition agreement? Does the $54,000 include that?
 
 
 44
 MR. KULLEN: The $54,000 is the promissory note. There is non-compete agreement of 20,000 to each of the plaintiffs. That is 40,000.
 
 
 45
 THE COURT: You owe that?
 
 
 46
 MR. KULLEN: No. The reason is all potential indebtedness to the plaintiffs was subject to offset under the agreement that any monies to be paid could be credited or offset.
 
 
 47
 THE COURT: We have 54,000 plus how much is owed under the non-comp agreement?
 
 
 48
 MR. KULLEN: 40,000.
 
 
 49
 THE COURT: So $94,000 that would otherwise be owed had you not had the offsets, right?
 
 
 50
 MR. KULLEN: Correct, Your Honor.
 
 
 51
 J.A. 137-38 (Emphasis added). Thus, the only argument made by defendants was to the effect that they owed the remaining $40,000 on the non-competition agreements, but that this obligation was offset by money owed them by plaintiffs in respect to other, unrelated matters in the sales agreement.
 
 
 52
 The claim for the recoupment of $40,000 already paid was not raised below. It should not now be entertained on appeal. Pinney Dock & Transp. Co. v. Penn Cent. Corp., 838 F.2d 1445, 1461 (6th Cir.), cert. denied, 488 U.S. 880 (1988).
 
 D.
 
 53
 Defendants argue that the district court erred in refusing to grant them an offset for allegedly uncollectible accounts receivable they purchased from plaintiffs. The sales agreement provides in pertinent part: "Purchaser shall be entitled to offset the first payments due Seller and Shareholders under the Promissory Notes ... for any accounts receivable of Seller which has [sic] not been collected by August 1, 1987...." J.A. 262.
 
 
 54
 The district court found that defendants' principal evidence in support of their claimed offset for uncollectible accounts receivable was Exhibit A to their Trial Exhibit 2. After a very careful examination of this exhibit in which the court found numerous and serious discrepancies, the court concluded that the exhibit, which purported to show the status of the accounts receivable purchased from plaintiffs as reduced by defendants' collection efforts, was instead a "running balance" that included "sales made by Grand at unknown times and in unknown amounts ... co-mingled with the original receivable figures." J.A. 30. As such, the district court found the exhibit "unreliable and untrustworthy," and it rejected this proof in its entirety. J.A. 27.
 
 
 55
 Defendants seek to avoid the consequences of this finding by arguing that, because the sales agreement allowed defendants to offset payments due plaintiffs under the promissory note with any accounts receivable remaining uncollected as of August 1, 1987, J.A. 262, the sales agreement and promissory note should be viewed as an "open price contract" subject to fluctuation by virtue of the offsets allowed for uncollected accounts receivable. They then argue that the burden of proving the value of the inventory was on the plaintiffs, because plaintiffs had the burden of producing evidence of the value of the note, and this could not be determined at a given time without proof of the value of the uncollected accounts receivable.
 
 
 56
 Tennessee, however, places the burden of proving a setoff on the party who claims it.
 
 
 57
 In Polk v. Torrence (1966), 218 Tenn. 680, 405 S.W.2d 575, the Supreme Court said that it is the general rule that where one claims a setoff, the burden of establishing the right of this setoff is upon the one claiming it.
 
 
 58
 This rule in Tennessee was also stated and followed by the Sixth Circuit Court of Appeals in Rolfe, et al. v. County Board of Education of Lincoln County Tennessee (1968), 391 F.2d 77.
 
 
 59
 Fulton v. Tennessee Walking Horse Breeders' Ass'n, 476 S.W.2d 644, 654 (Tenn.App.1971). The district court properly treated this claim for setoff as a counterclaim, the burden of proving which rested on the defendants. In failing to provide the court with accurate and trustworthy evidence establishing the amount the setoff, the defendants failed to carry their burden. Therefore, the district court was correct in refusing to allow any setoff for uncollected accounts receivable.
 
 E.
 
 60
 In a similar vein, defendants argue that the district court erred in refusing to allow them a setoff of $30,541.94 for obsolete inventory allegedly sold them. The sales agreement does not specifically provide for such a contractual setoff, but plaintiffs did warrant in paragraph 8(j) of the agreement that no more than $2,000 of the inventory they conveyed would be obsolete. Defendants' counter-claim asserts a breach of this warranty.
 
 
 61
 The warranty paragraph contains provisions which define obsolete parts for the purposes of the agreement:
 
 
 62
 [A] part number shall not be "OBSOLETE" if either (i) a sale of the part number has occurred in the past (12) months or (ii) the part number is listed in the current Maremont price list or (iii) the part number [is] included in the current product line of Grand.
 
 
 63
 J.A. 258.
 
 
 64
 The district court found that defendants' witnesses, Messrs. Robinson, Williams, and Wasik, had "no personal knowledge why this inventory was obsolete." J.A. 23. These witnesses all apparently testified that Bill Dyke was the employee who took the inventory and who made the decisions about its obsolescence. Id. Mr. Dyke himself, however, was not called as a witness.
 
 
 65
 Because there was no testimony concerning whether any of the inventory purchased by defendants met the definition of "obsolete" as set out in the sales agreement, the district court was justified in finding that defendants "failed to produce any competent evidence whatsoever regarding their entitlement to an offset for obsolete inventory." J.A. 23. This finding is not clearly erroneous.
 
 F.
 
 66
 Plaintiffs argue that the district court erred in failing to award them the interest and attorney fees called for by the promissory note of September 25, 1986. The note provides for reasonable attorney's fees of not less than 15 percent, the costs of collection, interest at the rate of 8 1/2 percent per annum, and an interest rate after default of 2 percent higher than the prime rate of Manufacturers National Bank of Detroit.
 
 
 67
 Although the district court recognized that "Tennessee courts have long upheld provisions in promissory notes which allow for an award of reasonable attorney fees," J.A. 50, it concluded that an award of attorney's fees and interest would not be "appropriate" in this case because plaintiffs had breached their non-competition agreements with Grand. It refused to award the agreed interest on the further grounds that plaintiffs did not make a demand for payment of the note before filing suit. However, demand was waived in the note.
 
 
 68
 According to the Supreme Court of Tennessee in Dole v. Wade, 510 S.W.2d 909, 912 (Tenn.1974),
 
 
 69
 [t]he law in this state on the issue of power of the court to determine the reasonableness of an attorney's fee, where such is stipulated in a note by percentage or otherwise, is stated by the Court in Holston National Bank v. Wood....
 
 
 70
 In Holston National Bank v. Wood, 140 S.W. 31, 34 (Tenn.1911), the court stated:
 
 
 71
 While a stipulation in a note for attorney's fees is valid and will be enforced by this court, the court is not bound by a provision to the effect that any particular amount shall be allowed for such fees, and, no matter what stipulation as to the amount is made in the face of the note, it will not be enforced unless it appears reasonable to the Court.
 
 
 72
 In Dole, the Tennessee Supreme Court also quoted with approval from 11 C.J.S. Bills and Notes § 726 as follows:
 
 
 73
 It is generally held that the amount of fees fixed by the instrument sued on is at least prima facie the sum recoverable, subject to reduction by the court in the exercise of its sound discretion, where such sum is unreasonable and excessive.
 
 
 74
 The court's quotation of this rule with approval implies that a court should not reduce a stipulated attorney's fee, which is "prima facie the sum recoverable," unless it is deemed "unreasonable and excessive." This conclusion is reinforced by language in the earlier opinions of the Tennessee Supreme Court holding that attorney's fees in a fixed percentage stipulated for in a note are integral terms of the note:
 
 
 75
 In this State a fee so provided for in a note is a constituent part of the obligation, enforceable by or in behalf of the holder, and it is not considered to be a distinct obligation or penalty to be enforced in behalf of the attorney or as a separate cause of action.
 
 
 76
 The liability of one who assumes to pay such a note includes liability for the attorney fee.
 
 
 77
 Merrimon v. Parkey, 136 Tenn. 645, 654, 191 S.W. 317 (1917). See also Jenkins v. Harris, 83 S.W.2d 562, 567 (Tenn.App.1935).
 
 
 78
 In this case, the court found the stipulated 15 percent attorney's fee to be neither unreasonable nor excessive. It found it to be "not appropriate," apparently because plaintiffs had breached their non-competition agreements (although not seriously). However, the remedy for plaintiffs' breach would normally be found in damages awarded to defendants, not forgiveness of attorney's fees on a separate promissory note which was not directly related to the non-competition agreements.
 
 
 79
 The district court did find that "this is not the typical lawsuit arising out of a willful and totally unjustifiable default on a note," J.A. 51, but that does not make the stipulated attorney's fees unreasonable or excessive. The attorney's fees were agreed to by the parties. When the court found the note to be in default and the defendants to be without legitimate excuses for non-payment, it should have considered whether the stipulated fee was unreasonable or excessive. It did not explain its findings in that regard. What reasons it did give are off the mark.
 
 
 80
 The district court's reasons for refusing to award the stipulated rate of interest are equally obscure. The district court held that "interest would not be appropriate in this case" because the court could not understand why plaintiffs waited as long as they did to file their action and because plaintiffs "never demanded, either orally or in writing, that they be paid prior to filing suit." J.A. 51. By its terms, the note waives demand, presentment, protest and notice of protest. J.A. 274. Stipulations for interest are valid and considered binding on the maker of a note in Tennessee. Merrimon v. Parkey, 136 Tenn. 645, 652, 191 S.W. 327 (1917). Moreover, Tennessee Code Annotated § 47-14-109 states that "[i]nterest on negotiable and non-negotiable instruments shall accrue according to the terms of the instrument...."
 
 
 81
 It is immaterial that the court could not understand why plaintiffs waited until they did to file their lawsuit. It is also immaterial that they made no formal demand for payment. Indeed, that failure is understandable in light of the two letters they received from Grand informing them that all further note payments would be withheld as setoffs to cover alleged breaches of warranty by the plaintiffs. The district court cites no authority for withholding the interest stipulated to by the parties, and its announced reasons for doing so are not recognized in the law. Under these circumstances, the district court erred in withholding stipulated attorney's fees and interest.
 
 III.
 
 82
 For the foregoing reasons, (1) the district court's conclusion that plaintiffs breached their non-competition agreements is REVERSED, (2) its award of a $40,000 setoff to the defendants is REVERSED and the cause is REMANDED for entry of a judgment of $20,000 for each plaintiff for the balance due on his or her non-competition agreement, (3) the district court's holdings that defendants failed to prove their setoffs for obsolete inventory and uncollectible accounts receivable are AFFIRMED, (4) the district court's refusal to allow defendants a further setoff for the $40,000 initially paid to plaintiffs as partial consideration for the non-competition agreements is AFFIRMED, (5) and the district court's refusal to award attorney's fees and interest as called for by the promissory note is REVERSED. On remand, the district court is directed to reconsider the question of attorney's fees, but, should it decide not to award them, it should explain why the stipulated fee, considered as an integral term of the note, is excessive or unreasonable.
 
 
 
 [1]
 She had previously defined a "jobber store" as a parts store, such as NAPA or Autowise, selling at retail to the public. J.A. 145-46
 
 
 [2]
 The district court's conclusion that plaintiffs also breached a letter agreement dated August 26, 1986, is erroneous as well. This matter was not raised in the pleadings, the letter agreement was unrelated to the non-competition agreements, and the record shows that J & J Manufacturing did not breach the agreement in any event